IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 12, 2006

## DAVID EARL PALMER v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Carroll County**
**No. 01CR-1650      C. Creed McGinley, Judge**

_____

**No. W2005-01421-CCA-R3-PC   -   Filed November 3, 2006**

_____

The petitioner, David Earl Palmer, was convicted by a jury of aggravated burglary and aggravated rape. The trial court sentenced the petitioner to five years for the aggravated burglary conviction and 25 years for the aggravated rape conviction with consecutive service for an effective sentence of 30 years. On direct appeal, this court affirmed the petitioner's convictions and sentences. The petitioner filed a petition for post-conviction relief, which the post-conviction court dismissed after a hearing. On appeal, the petitioner contends that the post-conviction court erred when it dismissed his petition because he received ineffective assistance of counsel and because he was illegally sentenced. After thoroughly reviewing the record and the applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3; Judgment of the Circuit Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JERRY L. SMITH and JOHN EVERETT WILLIAMS, JJ., joined.

Dwayne D. Maddox, III, Huntingdon, Tennessee, for the Appellant, David Earl Palmer.

Paul G. Summers, Attorney General & Reporter; Brian Clay Johnson, Assistant Attorney General; G. Robert Radford, District Attorney General; and Steve Jackson, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

The following facts, pertinent to the petitioner's convictions appear in this court's opinion affirming those convictions:

> During the evening of October 16, 2000, the victim, Kimberly Matlock, fell asleep on the couch with her two-year-old son while watching television. Sometime later, the victim woke up when [the petitioner] covered her face with a tee-shirt and told her to do what he wanted if she did not want to die. [The petitioner] dragged the victim

to her bedroom, put her on the bed, and tied her hands with a cord cut from an iron.

. . . [The petitioner] removed the victim's shorts and performed oral sex on her, then penetrated her. During this time, he told her he knew her husband, and that he had been watching her. He told the victim he loved her, but knew that she would not have anything to do with him, so he had to rape her. At some point, the victim tried to loosen the tee-shirt around her face so she could breathe better, and [the petitioner] struck her on the jaw.

After he was through raping her, [the petitioner] pulled the victim into the bathroom and placed her in the bathtub. He turned on the water and attempted to wash her lower body. When [the petitioner] was finished, he closed the shower door, turned off the lights, and left the room, telling the victim he would kill her if she called the police. The victim waited a few minutes until everything was quiet, then wrapped a towel around herself. She telephoned her mother and told her she had been raped.

. . . After the police questioned the victim for a few minutes, she was transported to the hospital where a rape kit was performed and a blood sample taken. All the victim could tell the police about the rapist was that he was an Afro-American because she saw his bare arm, and that he had a deep voice. The victim later testified that she had never met [the petitioner].

The next day, the victim returned to her home. . . . At the back of the apartment, a window screen lay on the ground, and a rain bucket was turned upside down beneath her bedroom window. The fan that had previously been in her bedroom window now lay on the floor. None of the fingerprints lifted at the scene matched [the petitioner's].

Lt. Tim Nanney interviewed [the petitioner] on October 19, and [the petitioner] gave a statement as to his activities on the night of the rape. . . . [The petitioner] consented to a DNA testing and the drawing of a blood sample. The testing revealed that the spermatozoa present in the victim's vaginal swabbing belonged to [the petitioner].

[The petitioner] took the stand in his own defense at trial, and drew a completely different picture of the events occurring on October 16, 2000. According to [the petitioner], he first met the victim some time in late August or early September. One day, while he was standing on a street corner, the victim drove by, stopped, and

-2-

asked [the petitioner] if he had any drugs. . . . During his first contact with the victim, [the petitioner] directed her toward a park where he purchased cocaine from James Haines. The victim gave him a small amount of drugs as payment, and they smoked the drugs together. . . .

. . . .

On October 16, 2000, the victim stopped [the petitioner] as he was walking home [and] asked him if he had any drugs. When he said he did not, the victim told him to come over to her house if he was able to purchase any drugs. After she left, [the petitioner] secured some drugs from Mr. Haines, and went to the victim's apartment. When he knocked on the back door, the victim let him in, and he followed her into the living room where she had been sitting with her son. They talked for a few minutes, and [the petitioner] gave her a small piece of cocaine. She asked for more, but [the petitioner] replied that he would not give her any more until she had sex with him.

The victim and [the petitioner] went into her bedroom where they first had oral sex and then intercourse. When they were finished, [the petitioner] got ready to leave and admitted he did not have any more drugs. The victim became very angry. . . . [The petitioner] felt that the victim had accused him of rape because she was mad that he reneged on his promise to give her drugs in exchange for sex.

*State v. David Earl Palmer*, No. W2001-02515-CCA-R3-CD, slip op. at 1-4 (Tenn. Crim. App., Jackson, Dec. 13, 2002).

After his convictions were affirmed, *see id*., the petitioner filed on March 19, 2004, a pro se petition for post-conviction relief. The post-conviction court appointed counsel, and an amended petition was prepared. As amended, the petition set out 15 alleged instances of ineffective assistance of counsel and a claim of illegal sentencing. The post-conviction court conducted an evidentiary hearing on March 16, 2005. In large measure, the evidence presented at the hearing consisted, as it often does, of the petitioner's litany of complaints about the actions of counsel, with counsel's testimony offering a conflicting view of the facts. Much of the evidence at the hearing below was geared toward factual assertions pertinent to the ineffective assistance claim.

The state called former counsel who addressed the instances of ineffective assistance alleged in the petition. Regarding the failure to subpoena James Haines for trial, counsel testified that her investigation revealed that Haines denied being a drug dealer, and therefore she did not think that his testimony would be beneficial. Counsel explained that even had she called Haines, his

-3-

testimony, at best, would have only related to the victim's credibility, and counsel made a tactical decision not to pursue that course considering the sympathy that the victim would likely engender.

Counsel specifically recalled discussing Haines with the petitioner. Counsel said that she consulted with the petitioner at the Carroll County Jail "a minimum of four times for at least an hour each." She and the petitioner discussed the entire case, and she advised the petitioner why she did not regard Haines as being a useful addition to the defense case.

The victim had two children. Regarding the victim's nine-year-old daughter, counsel agreed that she did not attempt to interview the child. To counsel's knowledge, law enforcement officers likewise had not interviewed the daughter. Counsel understood that the daughter was asleep and did not see her mother's attacker. Additionally, the victim "wasn't going to let this child talk to [counsel]." Moreover, in counsel's experience, jurors did not "like it much [when defense counsel] beat[s] up on a rape victim's kid."

When asked on cross-examination about Officer Bookout's failure to establish at trial any signs of forced entry, counsel explained that forced entry is not an element of aggravated burglary. Counsel recalled that the defense did establish that none of the fingerprints found on the victim's window matched those of the petitioner, and counsel did regard the lack of fingerprints as important to rebut the state's theory that the petitioner gained entry to the house through the window.

Counsel testified that her strategy did not include attacking the victim's credibility through exploiting the victim's prior criminal history or possible illegal drug use. DNA testing in the case established that the sperm inside the victim matched that of the defendant. Another consideration was the defendant's insistence that he and the victim had consensual sexual relations, despite evidence that the assailant bound the victim with an electrical cord cut from her iron.

Although the petition alleged that counsel's services were deficient for failure to object to a jury instruction about aggravated burglary, counsel could not recall any problems with the jury instructions. Similarly, although the petition alleged in a generic fashion that counsel had failed to assign error to the trial court overruling defense objections, counsel recalled no particular objection or ruling to which the petitioner might be referring.

Counsel was asked about the petitioner's preliminary hearing. Counsel recalled the hearing and recalled investigating and preparing for the hearing; counsel did not call any witnesses at the hearing. Counsel said that she consulted with the petitioner about the preliminary hearing to develop pertinent facts and to explain to the petitioner that "winning" the preliminary hearing was not her objective.

Counsel testified that she "worked hard" in preparing for trial. Counsel examined all of the state's documents and discovery in an effort to predict what the testimony of the state's witnesses would be. Counsel reviewed witness statements and interviewed witnesses. Two of the witnesses provided counsel with information that conflicted with their statements given to law

enforcement officers. Counsel characterized the discovery process in the case as "normal" and consistent with the state's open-file discovery policy.

Counsel provided the petitioner with a copy of everything received from the state. Counsel recalled one such item was a report of a medical examination of the victim. Counsel did not subpoena the medical examiner because he was prepared to testify that the victim was raped, that she was crying and upset, and that she had physical injury. That testimony would not have contributed positively to the theory of defense.

Counsel did not think that she photocopied crime scene photographs for the petitioner because the xerox quality of the copies was usually poor. Counsel did, however, show her discovery photographs to the petitioner, and they discussed what the photographs depicted.

Another ineffectiveness allegation centered on counsel's failure to challenge potential jurors including a juror who knew the victim and one of the investigating officers. Counsel did not "recall very much about the jury." Counsel did not exercise all of the defense challenges, and she believed that she asked the petitioner if there was anyone else he wanted to excuse from the jury. Counsel testified that it would have been "highly irregular" for a juror to be dismissed and then reseated on the jury panel.

Counsel did not recall her efforts regarding a motion for new trial. She simply remembered filing such a motion and that it was overruled.

The defense theory, according to counsel, was consensual sex. "That's what [the petitioner] told [her] happened, and [she] didn't . . . have anything else to go on." Counsel did not remember if the petitioner testified at trial, but counsel related that those decisions are customarily made by the client after consultation with counsel.

On cross-examination, counsel testified that she was not involved in the case until the first of November; at that point, the petitioner had been under arrest since October 19. Counsel estimated that she would have met with the petitioner at least once for a lengthy period of time before the preliminary hearing. Counsel was uncertain whether she spoke with any of the investigating officers prior to the hearing; she believed that the petitioner was the only person whom she consulted.

Counsel recalled that a search warrant was executed prior to her being hired by the petitioner. The petitioner, however, was in contact with counsel during that period. In counsel's estimation, the search warrant affidavit "was a bit slim on probable cause," and she contested probable cause at the preliminary hearing. At a later time, the trial court overruled a formal motion to suppress that counsel filed. The disposition of the motion ultimately was inconsequential because the petitioner had signed a consent form agreeing to provide blood.

After the petitioner was indicted by the grand jury, counsel obtained and reviewed discovery materials from the state. She spoke with the petitioner "probably a minimum of four

occasions at the jail [about] the discovery." Counsel recalled interviewing only one law enforcement officer, but she did not ask to look at his file. Counsel did not remember if she ever discussed with the petitioner the victim's medical examination. Counsel's review of the medical report disclosed no exculpatory evidence.

Counsel reiterated that Haines, the individual who the defendant wanted subpoenaed, was not going to corroborate anything the petitioner wanted to introduce. Although counsel did not speak to Haines, counsel's assistant did. Haines professed to know nothing about drug sales to the victim. Counsel's assistant did not ask Haines if he had previously seen the petitioner and the victim together. Counsel's office personnel were unable to uncover any criminal history of the victim.

Counsel was again questioned about problems with a juror who was dismissed but then reseated. Counsel again responded that she did not recall anything of that nature. The post-conviction judge, who also presided at the trial, interjected that he also had no recollection of such an event. Counsel agreed that she had not challenged the racial composition of the jury, and she did not know how many African Americans served on the petitioner's jury.

The petitioner testified in the evidentiary hearing that while incarcerated, he had filed a pro se post-conviction petition. After the court appointed counsel to represent the petitioner, the petition was amended. The petitioner explained that his allegation about the juror arose when the group of potential jurors were being questioned. The petitioner said that he did not want a specific juror and communicated his desire to counsel. Counsel, however, said that because the juror formerly was acquainted with the victim, the juror might possess information casting doubt on the victim's credibility. The petitioner testified that he thought the juror's name was Kristy and that she was from Skullbone.

The post-conviction court expressed concern about the juror allegation and declared that the trial court had not excused a juror, allowed the juror to remain in the audience, and then reseated the juror. The post-conviction court stated, "[S]omeone is badly mistaken."

The petitioner testified that he knew Haines would deny being a drug dealer, "but everybody knows he's a known drug dealer." As long as Haines was not worried about being arrested, the petitioner claimed that Haines would have testified to seeing the petitioner and the victim together prior to the day of the rape. Petitioner also disagreed that the victim's daughter saw nothing. He testified that the child came into the room, and the victim told the child to get cigarettes in the front room and bring them to the victim.

The petitioner conceded that he did not know how many times counsel met with him. He then estimated meeting only two or three times with counsel. The petitioner's testimony about counsel having provided him copies of discovery was vague. He claimed that counsel told him no photographs existed, and she told him the only thing she received in discovery was the DNA test results. According to the petitioner, two or three days before trial, counsel showed him the medical examination report on the victim. He testified that he did not see any photographs until trial when they were introduced by the state.

The petitioner agreed that counsel did speak to him pretrial about the window and lack of fingerprint evidence. He criticized counsel's handling of the information, however, and said that his fingerprints should have been on the back door.

On cross-examination, the petitioner agreed that counsel discussed potential jurors with him and which ones should be excused. He then claimed that it was counsel's decision about which jurors to excuse. He was aggrieved, however, that counsel did not excuse the one juror he requested.

As for the witness James Haines, petitioner agreed that he never had an opportunity to talk with Haines about potential testimony and, therefore, did not know what Haines would say. The petitioner seemed unconcerned that Haines's testimony could have been unfavorable.

The petitioner contradicted his earlier testimony about what he did and did not receive from counsel. Ultimately, petitioner acknowledged receiving more than just a DNA-related document. He then explained, "I read the majority of everything that she sent to me that I felt important."

Finally, the petitioner was cross-examined about his complaint that counsel did not exploit the absence of a forced entry. Evidently, the petitioner believed that he could not have been convicted of aggravated burglary if there was no proof of forced entry. The post-conviction court noted that the petitioner was just quibbling about the elements of aggravated burglary.

At the conclusion of the hearing, the post-conviction court took the matter under advisement. On May 17, 2005, the court issued a written order dismissing the petition for post-conviction relief. The order includes factual findings, credibility determinations, and a cogent, succinct analysis of the various claims. The post-conviction court cited *State v. Gomez,* 163 S.W.3d 632 (Tenn. 2005), as disposing of the petitioner's illegal sentencing complaint, and it then addressed the allegations of counsel's ineffectiveness. The post-conviction court credited trial counsel's testimony relative to her extensive investigation and trial preparation, her interviews with the petitioner, her explanation of the discovery process, her tactical decisions not to call James Haines or the victim's daughter at trial, and her development of a theory of defense in light of the DNA results. The post-conviction court found the record devoid of proof suggesting that minorities were improperly excluded from the jury pool. As for the petitioner's insistence that a juror was excused but later reseated, the court concluded that the petitioner's assertion was misplaced; the jury selection transcript reflected that a juror was mistakenly discharged because of a misnomer on the form for the defendant's peremptory challenges, and once the mistake was discovered, it was promptly corrected and done with the knowledge and consent of the petitioner.

The post-conviction court summarized its findings in the following fashion:

In summary, the petitioner has not shown any grounds which would entitle him to post-conviction relief. He was adequately and fully represented by an experience[d] trial attorney who engaged in

extensive investigation, advanced every possible legal theory that was available to the petitioner and did so with the petitioner's full knowledge and consent. In short, there is nothing in this record which would remotely suggest that there has been any constitutional abridgement.

As we shall explain, our review convinces us that the post-conviction court's rulings should be affirmed.

**Standard of Review and Ineffective Assistance of Counsel**

To obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2003). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. *Id*. § 40-30-110(f). A post-conviction court's factual findings are subject to a de novo review by this court; however, we must afford these factual findings a presumption of correctness, which is overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this court, with no presumption of correctness. *Id*. at 457. The Tennessee Supreme Court has held that the issue of ineffective assistance of counsel is a mixed question of law and fact and, as such, is subject to de novo review. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish an abridgement of the right to the effective assistance of counsel as guaranteed in the Sixth Amendment to the United States Constitution and Article I, section 9 of the Tennessee Constitution, the claimant must show both that counsel's performance was deficient and that the deficiency prejudiced the defense. *Nichols v. State*, 90 S.W.3d 576, 586 (Tenn. 2002); *Strickland v. Washington*, 466 U.S. 668, 692, 104 S. Ct. 2052, 2067 (1984). Deficient performance of counsel equates to "acts or omissions [that] were so serious that they fell below an objective standard of reasonableness under prevailing professional norms." *Nichols*, 90 S.W.3d at 587. The court reviewing counsel's performance not only evaluates the claimed deficiency from counsel's perspective at time of the alleged acts or omissions, but it also indulges "a heavy measure of deference to counsel's judgments." *Id*.; *Burns*, 6 S.W.3d at 462. Counsel should not be deemed to have rendered deficient performance merely because a different procedure or strategy might have produced a different result. *See Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980).

To establish that deficient performance resulted in prejudice, the claimant is required to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. The claimant "must establish that the deficiency of counsel was of such a degree that it deprived the defendant of a fair trial and called into question the reliability of the outcome." *Nichols*, 90 S.W.3d at 587.

-8-

In our estimation, the evidence overwhelmingly supports the post-conviction court's findings in this case, and it is unnecessary to dissect every point in detail. The court made reasonable and unassailable credibility determinations that supported its conclusion that the petitioner received effective assistance of counsel, and the petitioner on appeal simply restates his complaints in a conclusory fashion that does not persuade us that the court's dismissal of the petition was erroneous. We note that one crucial defect in the petitioner's case is that the potential witnesses and unexamined witnesses were not called to testify at the post-conviction hearing. *See Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990) (imperative that witnesses testify to determine prejudice). On the jury-related complaints, the petitioner wholly failed to carry his burden of demonstrating entitlement to relief.

## Sentencing

In his final issue the petitioner complains that the trial court imposed a sentence based upon facts not reflected in the jury verdict or admitted by the petitioner. Relying on *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000), and *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004), the petitioner insists that his "enhanced" sentence is, therefore, illegal and not authorized by the United States Constitution; he seeks reduction of his sentence to the statutory minimum.

*Apprendi* and *Blakely* do not avail the petitioner for two reasons. First, the Tennessee Supreme Court's decision in *State v. Gomez*, 163 S.W.3d 632 (Tenn. 2005), disposes of the defendant's *Blakely* argument. In *Gomez*, the court determined that despite the ability of trial judges to set sentences above the presumptive sentence based on the finding of enhancement factors neither found by a jury or admitted by a defendant, Tennessee's sentencing structure does not violate the Sixth Amendment and does not conflict with the holdings of *Blakely*, *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005), or *United States v. FanFan*, the case consolidated with *Booker*. The *Gomez* court explained that "[t]he Reform Act [of Tennessee] authorizes a discretionary, non-mandatory sentencing procedure and requires trial judges to consider the principles of sentencing and to engage in a qualitative analysis of enhancement and mitigating factors . . . all of which serve to guide trial judges in exercising their discretion to select an appropriate sentence within the range set by the Legislature." *Gomez*, 163 S.W.3d at 661.

Second, the *Gomez* court also ruled that *Blakely* did not announce a new rule and that even if *Blakely* had announced a new rule, relief could be granted only in "pipeline" cases, i.e., those in which the issue had been presented for review. 163 S.W.3d at 650. The petitioner's case is a separate collateral attack and is not in the pipeline.

## Conclusion

In conclusion, we find no reversible error and affirm the post-conviction court's denial of post-conviction relief.

_____
JAMES CURWOOD WITT, JR., JUDGE